## CHICAGO & N. W. RY. CO. v. BEWSHER.

(Circuit Court of Appeals, Eighth Circuit. July 28, 1925.)

No. 6831.

**1. Carriers ⬤➝160—Carriers might, prior to amendment of Interstate Commerce Act, limit time within which suits might be brought on contracts of carriage.**

Prior to amendment by Act Feb. 28, 1920, §§ 436–438 (Comp. St. Ann. Supp. 1923, § 8604a), to Interstate Commerce Act, § 20, par. 11, carriers might limit time within which suits might be brought on contracts of carriage, subject only to reasonableness of the limitation.

**2. Carriers ⬤➝160—Carriers held unauthorized to place any flat restriction on time within which suit may be brought on contracts of carriage, based on time of delivery of the shipment.**

Under Interstate Commerce Act, § 20, par. 11, as amended by Act Feb. 28, 1920, §§ 436–438 (Comp. St. Ann. Supp. 1923, § 8604a), carriers held unauthorized to place any flat restriction on time within which suit may be brought on contracts of carriage, based on time of delivery of the shipment, rather than time of giving of the notice prescribed therein.

**3. Carriers ⬤➝160—Limitation in bill of lading for institution of suits for loss, damage, or delay on contracts of carriage, held void, as contravening amendment of Interstate Commerce Act.**

Provision of bill of lading that suits for loss, damage, or delay on contracts of carriage should be instituted only within two years and one day after·delivery of the property, or, in case of failure to make delivery within two years and one day, after a reasonable time for delivery has elapsed, held void, as contravening Interstate Commerce Act, § 20, par. 11, as amended by Act Feb. 28, 1920, §§ 436–438 (Comp. St. Ann. Supp. 1923, § 8604a).

**4. Carriers ⬤➝59—Holder of order bill of lading not estopped to maintain action for damages for issuance of false bill of lading by redelivery of claim to shipper and shipper's settlement with carrier.**

In action by holder in good faith of order bill of lading, under Bill of Lading Act Aug. 29, 1916, § 22 (Comp. St. § 8604kk), for damages caused by carrier's nonreceipt of part of carload of wheat described in bill of lading, plaintiff *held* not estopped to maintain his action by redelivering claim and supporting papers to shipper, and by shipper's settlement, where claim made and filed was for wheat declared to have been lost in transit.

**5. Carriers ⬤➝52(2)—Carrier may show that goods described in bill of lading were never delivered, and is not estopped by recitals in bill.**

Carrier, issuing a bill of lading, may show that the goods described therein were never in fact delivered, and is not estopped by recitals in such bill.

**6. Carriers ⬤➝55—Bill of Lading Act manifests congressional intention to make ordinary bills of lading fully negotiable.**

Bill of Lading Act Aug. 29, 1916 (Comp. St. §§ 8604aaa–8604w), manifests a clear intention of Congress to make ordinary bills of lading fully negotiable and they are to be considered so as to holders in good faith, unless they carry some of the notices or declarations specified in the act, or others of like import, or some notice or recitation inconsistent with negotiability.

**7. Carriers ⬤➝59—Carrier held liable to holder in good faith of order bill of lading for damages caused by nonreceipt of part of carload of wheat; "weight subject to correction."**

Carrier *held* liable to holder in good faith of order bill of lading covering car of wheat for damages caused by carrier's nonreceipt of part of the goods, in view of Bill of Lading Act Aug. 29, 1916, §§ 20, 22 (Comp. St. §§ 8604jj, 8604kk), notwithstanding that wheat was loaded by shipper, and that bill of lading recited that weight was "subject to correction"; such words not being of "like purport" to the words "shipper's weight, load, and count," or "shipper's weight," or that weight of wheat was "said to be" weight recited in bill of lading, within section 21 (Comp. St. § 8604k), prescribing what descriptions in bill of lading shall not render carrier liable.

In Error to the District Court of the United States for the District of Nebraska; Joseph W. Woodrough, Judge.

Action by Augustus H. Bewsher, doing business as the Bewsher Company, against the Chicago & Northwestern Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Wymer Dressler, Robert D. Neely, and Paul S. Topping, all of Omaha, Neb., for plaintiff in error.

R. B. Schuyler, of Omaha, Neb., for defendant in error.

Before SANBORN and KENYON, Circuit Judges, and SCOTT, District Judge.

SCOTT, District Judge. This is an action by Augustus H. Bewsher, doing business as the Bewsher Company, a grain dealer at Omaha, Neb., against the Chicago & Northwestern Railway Company, to recover $650.-

75 damages alleged to be due on account of the issuance of an order bill of lading to one Albert Swick at Buffalo Gap, S. D., for 66,000 pounds of bulk wheat. Plaintiff in his petition alleges in substance that on or about the 27th day of December, 1920, Albert Swick loaded at Oral, S. D., defendant's car No. 118,720 with wheat; that said wheat was consigned to the plaintiff at Omaha, Neb., and the duly authorized agent of defendant at Buffalo Gap, S. D., issued a bill of lading covering said wheat, a copy of which bill of lading is exhibited on plaintiff's petition; that said bill of lading with draft attached was forwarded from the Oral State Bank, of Oral, S. D., to the Merchants' National Bank, of Omaha, Neb.; that said draft was drawn on the plaintiff for the amount of $1,900, which draft was honored and paid by the plaintiff on January 3, 1921; that at the time plaintiff honored said draft he was the holder in good faith of said order bill of lading and paid $1,900 to Merchants' National Bank, agent of Albert Swick, the shipper, relying upon the description set forth in said bill of lading, and at the time actually believed that there was 66,-000 pounds of wheat shipped in said car; that as a matter of fact said car never contained 66,000 pounds of wheat, but only contained 45,590 pounds; that defendant company negligently failed to weigh the wheat at the time of shipment, and failed to notify plaintiff of the fact that said wheat was not weighed.

Plaintiff further pleads that on or about the 3d day of February, 1921, having prior thereto taken an assignment of the claim of said Albert Swick, he filed a claim for the account of plaintiff with defendant, together with proof of loss thereon, said claim being covered by defendant's claim No. 201,977—Desk 1; that said claim was filed with defendant in less than 90 days from the date of delivery of said wheat at destination; that on or about the 14th day of May, 1921, defendant refused to pay said claim, but did offer to compromise the same for the amount of .$54.55. The bill of lading exhibited on plaintiff's petition recites the receipt at Buffalo Gap, S. D., from Albert Swick, C & NW car No. 118,720, and under the description of articles, recites: "Bulk Wheat, 60 M car Ordered 80 M car furnished Co C &NW Weight (subject to correction) 66,-000 Loaded at Oral SD."

Defendant, answering, admits that on the date alleged Albert Swick loaded the car in question with bulk wheat at Oral, S. D., and consigned same to himself at Omaha, Neb., notifying the plaintiff company; admits that the bill of lading was issued as alleged; and concludes by denying all other allegations of plaintiff's petition. Defendant, further answering, pleads four separate defensive paragraphs, the order of which we transpose somewhat, to meet what we deem to be the logical order of their consideration. These defenses are:

(1) That section 2 of said bill of lading provides that no suit shall be maintained thereon unless commenced within two years and one day from the delivery of the goods therein, and defendant alleges that this suit was not commenced within said time, and is therefore barred by the terms of said bill of lading.

(2) That plaintiff made claim against defendant on the 4th day of February, 1921, for $577.76 for alleged loss of grain from said car during transportation, and among the papers presented to the defendant in support of said claim was a copy of an assignment made by Albert Swick to plaintiff; and on March 8, 1921, defendant wrote a letter to plaintiff, declining to recognize said claim, and defendant alleges that this suit was not commenced within two years from March 8, 1921, and is therefore barred by operation of law.

(3) That plaintiff is estopped to maintain this suit for the reason that, after plaintiff had made said claim upon defendant and said claim was declined by defendant, plaintiff delivered to Albert Swick all supporting papers, including the assignment which plaintiff had presented to defendant in support of said claim, and thereafter the said Albert Swick again presented to the defendant said claim for alleged loss of grain in transit from said shipment, and Albert Swick and defendant entered into a compromise and settlement of said claim for the sum of $54.05, and the defendant on June 2, 1921, paid to Albert Swick the sum of $54.05 in full settlement of all claims on account of said shipment; that by reason of said conduct plaintiff is now estopped to claim that he had any interest in said shipment or in said claim, other than as the representative of Albert Swick, and defendant alleges that said claim has been fully compromised and settled.

(4) That the wheat mentioned in plaintiff's petition was loaded by the shipper on facilities furnished by the shipper, and was not loaded by the defendant, and same was received under the terms of said bill of lad-

ing, which provided that the weight of said shipment was subject to correction.

The case was tried upon the issues as stated. The facts were largely stipulated, and from such stipulation and the testimony of plaintiff Bewsher, the following facts appear without controversy:

That about the date alleged Albert Swick loaded the car of bulk wheat at Oral, S. D., That as of the same date defendant's agent at Buffalo Gap issued the bill of lading in question with the recitals as stated in plaintiff's petition. That the car was weighed on track scales at Chadron, and the weight of the grain, using the gross weight and then subtracting the stenciled weight on the car, resulted in a net weight of 48,300 pounds, and that the weight ascertained at Omaha, when the grain was unloaded and weighed by the grain exchange weighmaster, was 45,590 pounds. That there was no actual loss of grain from the car, and the car was in good condition, and the difference between the indicated weight on the bill of lading and the unloading weight was never actually put into the car. That on February 4, 1921, plaintiff presented a claim to defendant, having first taken an assignment from Albert Swick, for the sum of $577.76 for shortage in the shipment, supporting his claim by a copy of the bill of lading, weights, and the assignment of the claim from Swick. That on March 8, 1921, H. C. Howe, freight claim agent, claim department of defendant, wrote the Bewsher Company the following letter:

"Referring to your claim No. 746, our number as above, for $577.76, alleged loss of wheat shipped from Buffalo Gap, S. D., to Omaha, Neb., amount of wheat claimed to have been lost 20,780 pounds: From the investigation I have made of this matter, I find that this car was weighed at Chadron, a short distance from Buffalo Gap, with a net weight of 48,300 pounds. Deducting 800 pounds for the grain doors would leave a net weight of 47,500 pounds, and as your weight at Omaha was 45,590, it is quite clear to me that there was no loss beyond the 1,910 pounds, and that an error has been made in weighing at point of shipment. There is no record of the car being in bad order. It arrived under proper seals, and therefore I cannot see any greater loss than the 1,910 pounds, less 67 pounds for shrinkage, which, together with the freight on the shrinkage and the price, $1.65, would leave $54.05 due you, which I am willing to pay."

That on April 5, 1921, the Bewsher Company wrote defendant the following letter:

"Please refer to yours of March 8th, file R–201977–1. The shipper requests us to instruct you to return all papers filed in connection with this claim, so that he can turn them over to an attorney, with instructions to bring suit. Your offer of settlement is too ridiculously low to be given consideration, in view of the shipper's contention that he can well substantiate the weight loaded into this car. Therefore be good enough to return these papers to us at once."

That after some delay the supporting papers of the claim were returned by the defendant to the plaintiff, who transmitted the same to Albert Swick with the following letter:

"May 16, 1921.

"Mr. Albert Swick, Oral, So. Dak.— Dear Sir: Although we instructed the Northwestern, under date of April 5th, to return all papers we filed with them in your claim for shortage on car 118720, shipped December 27, 1920, we only to-day received them, and herewith return them to you. The recall of these papers was due to the fact that, while this claim was filed for $577.76, as indicated by copy of invoice which we herewith attach, they made an offer of settlement of only $54.05, which we refused, and suggested to you that you place these papers in the hands of your attorney, and, if you are in a position to substantiate the weights as loaded into the car beyond any question of a doubt, he can recover for you. We will be very glad to furnish any information your attorney may need from this end of the line, and assist in any way possible to help recover this money for you. We think you will find that your attorney will be willing to handle this on a contingency fee; that is, a percentage of the amount he collects, and, if he collects nothing, he will probably only ask you to pay the costs that he has been put to in the suit. We wish you luck in this collection, and, as before stated, if we can be of additional service in recovering this amount, let us know. We are also returning you the weight tickets you sent us at the time we asked you for a copy of your weights in connection with this claim.

"Yours very truly, Manager."

That Albert Swick, following receipt of the supporting papers, communicated with the claim department of defendant, and made settlement of the claim for the sum of $54.05, being the amount of shortage ascertained by defendant.

In addition to the foregoing facts, which were stipulated, plaintiff testified in his own

behalf to the custom and method of handling such transactions in his office, which was in substance that the clerk or bookkeeper, on presentation of the draft and bill of lading would figure out the value of the contents of the car, based on the existing state of the Omaha market, and if there was an apparent overdraft they would submit it to him, as to whether it should be paid; that if the car was clear, and no apparent overdraft, he would never see the papers; that his usual custom was to allow the shipper to draw from 75 to 85 per cent. of the value of a shipment; that a man whose credit was without question could probably draw 90 or 95 per cent., and occasionally $100 or $150 overdraft would not be questioned; that Mr. Swick was a customer that he would not allow to overdraw very much, but would try to hold his business by not telling him he doubted his credit, but at the same time would not like to pay an overdraft for him; that plaintiff procured the assignment of the claim from Albert Swick and filed the claim with the defendant, calling attention to the assignment and requesting payment direct to him; that he was never advised of the settlement by Swick until shortly before suit was begun.

The record shows without controversy that plaintiff honored the draft for $1,900 and paid the same, and has not been repaid; and it is stipulated that, if plaintiff is entitled to recover anything, he is entitled to recover $595. At the conclusion of defendant's testimony both parties rested, and upon motion of the plaintiff the court directed a verdict for the plaintiff for the amount above indicated, to which defendant excepted, and after entry of judgment sued out writ of error, and now assigns the following errors:

"I. The court erred in instructing the jury to return a verdict for the plaintiff and in refusing to instruct a verdict for defendant.

"II. The court erred in holding and deciding that the provision in the bill of lading involved in this suit, limiting the right to bring the suit to a period of two years from the time the claim, or any part thereof, was declined, was null and void.

"III. The court erred in holding and deciding that the letter written by H. C. Howe to the Bewsher Company and contained in the bill of exceptions did not constitute a declination of said claim, or any part thereof, within the meaning of the Interstate Commerce Act as amended.

"IV. The court erred in entering judgment in favor of the plaintiff and against the defendant."

The foregoing assignment of errors was filed with the clerk at the time the writ of error was sued out. Assignment II above is now apparently abandoned, and we think properly so, as it had no foundation in the record. Counsel for plaintiff in error on their brief assign that error in the following language:

"The court erred in its ruling of law upon the proposition that the limitation in the bill of lading restricting the right to commence suit within two years, and not after, from the time of shipment, was null and void under the Interstate Commerce Act."

Counsel in briefs and arguments have not followed the order of assignment of error, nor confined themselves strictly to the propositions involved therein. We are therefore of opinion that the questions presented for decision can be more logically discussed by following the order of the defenses as they appear in our statement of the issues. These questions are:

(1) Is the provision in section 3 of the bill of lading that "suits for loss, damage or delay, shall be instituted only within two years and one day after delivery of the property, or, in case of failure to make the delivery, then within two years and one day after a reasonable time for delivery has elapsed," void as contravening the amendment of February 28, 1920, to paragraph 11 of section 20 of the Act to Regulate Commerce?

(2) May and should the court read out of the provision quoted the words, "after delivery of the property," etc., and read into the contract the provision in said amendment that such period for institution of suits be computed from the date when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part thereof specified in the notice?

(3) Is plaintiff estopped to maintain the suit because he redelivered the claim and supporting papers to Albert Swick with direction to commence suit, and the settlement of the claim by Albert Swick?

(4) Is plaintiff concluded by the fact that the grain was loaded by the shipper and that the bill of lading recited that the weight was "subject to correction"?

[1] We consider these questions in the order stated. It is well settled that, prior to the amendment approved February 28, 1920, it was entirely competent for carriers to limit the time within which suits might be brought on contracts of carriage, subject

only to the reasonableness of the limitation. Indeed, we are not without authority on the subject as applied to the particular statute as it existed prior to the amendment. Leigh Ellis & Co. v. Payne (D. C.) 274 F. 443, affirmed by the Circuit Court of Appeals for the Fifth Circuit in Leigh Ellis & Co. v. Davis, 276 F. 400, and affirmed by the Supreme Court of the United States in Leigh Ellis & Co. v. Davis, 260 U. S. 682, 43 S. Ct. 243, 67 L. Ed. 460.

Under this statute, as it existed before the amendment, and other provisions relative to the filing of claims, hardship often occurred by reason of the delay of the carrier in giving notice of its disapproval of the claim, often resulting in an unreasonable balance of time within which the shipper might institute his suit. This was at least one of the evils which Congress sought to remedy by the amendment of February 28, 1920. By that amendment the words, "such period for institution of suits to be computed from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice," were added to the previous paragraph, making the paragraph read as follows:

"Provided further, that it shall be unlawful for any such common carrier to provide by rule, contract, regulation, or otherwise a shorter period for giving notice of claims than ninety days, for the filing of claims than four months, and for the institution of suits than two years, such period for institution of suits to be computed from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice." Comp. St. Ann. Supp. 1923, § 8604a.

[2] It seems to us clear that, after the amendment quoted, any flat restriction of time within which suit might be brought based upon the time of delivery of the shipment, rather than the time of the giving of the notice prescribed, would be in contravention of the amendment, and "be unlawful" within the purview of the amended paragraph.

[3] But plaintiff in error, probably anticipating the possibility of the conclusion we here reach, contends that, notwithstanding the inconsistency of the language of the provision of the contract with the amended statute, the court should read out of the contract that part of its express language which initiates the time limit at the date of shipment, and read into the contract the provision of the amendment of 1920. In support of this contention counsel cites American Railway Express Co. v. Lindenburg, 260 U. S. 584, 43 S. Ct. 206, 67 L. Ed. 414. We do not think this case in point on the question under consideration. In that case the unlawful provision of the receipt could be readily separated from the remaining provisions, and that case merely holds that the presence of the unlawful provision did not render unlawful others which were separable from it. In the instant case, however, we are asked, not only to read out of the contract a particular expressed provision, but to substitute therefor another entirely different provision, and thereby to declare lawful and enforceable a form of contract which Congress deliberately undertook to and did prohibit. We are constrained to the conclusion that this cannot be done.

[4] We come now to the question of estoppel. Is the plaintiff estopped by his conduct in redelivering the claim and supporting papers to Swick, and by Swick's settlement? Examination of the claim filed with the defendant and its supporting papers makes clear that the claim made and filed was for wheat declared to have been lost in transit. The contention was for a disparity in weight between the time of loading and the time of unloading. There was a difference between the claim of the shipper and the fact as ascertained by the defendant. That Swick, the shipper, and the plaintiff, proceeded upon the theory that 66,000 pounds of wheat had been loaded, is clearly indicated by plaintiff's letter to Swick when he returned the claim and supporting papers. He says: "If you are in a position to substantiate the weights as loaded into the car beyond any question of a doubt, he can recover for you." It is clear from the record that throughout all negotiations prior to the beginning of suit, all parties proceeded upon the theory that the controversy was over grain lost in transit, and that was plaintiff's thought at the time he returned the claim and supporting papers. But the plaintiff at least was mistaken in this assumption.

As to whether Swick was mistaken is a matter upon which the record throws no light. In any event, Swick on return of the papers reopened negotiations with the defendant, and promptly arrived at a settlement on the basis of the amount of grain actually lost in transit, and received in settlement full payment therefor. It is beyond question that the $54.05 received by Swick

was all that he could possibly have recovered, had he instituted suit and prosecuted it to judgment. Under no theory suggested or advanced was the defendant liable to Swick for more grain than he actually loaded. And it was a claim for grain loaded that Swick undertook to assign, and that plaintiff undertook a redelivery, and for which settlement was made. We think such a settlement has no concluding effect upon the cause of action for damages for the issuance of a false bill of lading, liability for which is to be established under the provisions of section 22 of the Bill of Lading Act, approved August 29, 1916 (Comp. St. § 8604kk). The cause of action declared in the plaintiff's petition is entirely different from that declared in the claim originally filed with the defendant. We therefore conclude that the plaintiff is not estopped by the Swick settlement.

Finally, is plaintiff concluded by the fact that the grain was loaded by the shipper, and that the bill of lading recited that the weight was "subject to correction"? Examination of this question leads us to consider the legal character of bills of lading, and some mutations of such character brought about by national legislation. It has been almost universally held that a bill of lading is not only a receipt, but a contract; and numerous decisions of state courts have clothed such instruments with a character of negotiability more or less complete. For examples of these decisions one may consult 6 Cyc. under head of "Carriers," subhead "Bills of Lading," and for a discussion of the principle of estoppel of the issuance of a bill of lading particularly, page 418 et seq. See, also, 1 Hutchinson on Carriers (3d Ed.) § 157 et seq. The Supreme Court of the United States, however, had long prior to the Act of Congress of August 29, 1916, commonly called the Bill of Lading Act, declared its own views with respect to these instruments. In Pollard v. Vinton, 105 U. S. 7, 26 L. Ed. 998, Mr. Justice Miller, in speaking for that court, said:

"A bill of lading is an instrument well known in commercial transactions, and its character and effect have been defined by judicial decisions. In the hands of the holder it is evidence of ownership, special or general, of the property mentioned in it, and of the right to receive said property at the place of delivery. Notwithstanding it is designed to pass from hand to hand, with or without indorsement, and it is efficacious for its ordinary purposes in the hands of the holder, it is not a negotiable instrument or obligation in the sense that a bill of exchange or a promissory note is. Its transfer does not preclude, as in those cases, all inquiry into the transaction in which it originated, because it has come into hands of persons who have innocently paid value for it. The doctrine of bona fide purchasers only applies to it in a limited sense.

"It is an instrument of a twofold character. It is at once a receipt and a contract. In the former character it is an acknowledgment of the receipt of property on board his vessel by the owner of the vessel. In the latter it is a contract to carry safely and deliver. The receipt of the goods lies at the foundation of the contract to carry and deliver. If no goods are actually received, there can be no valid contract to carry or to deliver."

[5] It was held in that case that, although innocent, the indorsee and holder of a bill of lading with draft attached could not recover; it being shown that the cotton for which the bill was issued was never delivered to the master of the boat. This decision was followed in Missouri Pacific R. Co. v. McFadden, 154 U. S. 155, 14 S. Ct. 990, 38 L. Ed. 944, and in many other cases. So it seems to us to have been firmly established by decisions of the Supreme Court that the carrier issuing a bill of lading may show that the goods described therein were never in fact delivered, and that such carrier is not estopped by the recitals in such bill. It is not so well settled, however, that where a shipment has actually been delivered, but the goods fall short of the quantity declared in the bill of lading, that the carrier may with equal success urge such defense. This question is quite exhaustively discussed by Mr. Freeman in a note to Chandler v. Sprague, 38 Am. Dec. at pages 413 and 414. The conclusion there is apparently arrived at that the bill of lading is not conclusive as to quantity. The author of the note on page 414 criticizes the application of the rule where a portion of the goods have been delivered. It is there said:

"A plain distinction exists, as it seems to us, between the two classes of cases. There is some show of reason for holding that a bill of lading issued by a master or other agent, where no goods have been shipped, is beyond the agent's authority, and therefore void even in the hands of a stranger who has in good faith advanced money on it. But where there is a shipment of goods, the master or agent has authority to sign a bill of lading, and if he misrepresents the quantity of goods, and an innocent third person

is thereby induced to part with his money on the faith of the representation, the principal ought certainly to be bound, because the agent has not acted outside of his authority, but has merely abused it. "

[6] Whatever may be the merits of the argument here under consideration of the doctrine of estoppel in pais, it has been sufficiently settled in the federal jurisdiction that no estoppel results by reason of the negotiable character of the instrument. This fact no doubt influenced in a measure the action of Congress in the enactment of the Bill of Lading Act. While that act does not in so many words declare bills of lading to be negotiable instruments, we think, from the implications of the various provisions of the act and the repeated declarations that things specified shall not render these instruments nonnegotiable, that it was the clear intention of Congress to so legislate that ordinary bills of lading may be fully negotiable, and are to be considered so as to holders in good faith, unless they carry some of the notices or declarations specified in the act or others of like import, or some notice or recitation inconsistent with negotiability.

Three sections of the act, sections 20, 21, and 22 (Comp. St. Ann. Supp. 1923, §§ 8604jj—8640kk), should be carefully analyzed in determining the question under consideration. Section 20 deals with goods loaded by the carrier, and prescribes certain duties of the carrier in such cases. In case of package freight, the carrier must "count the packages," and, if bulk freight, "ascertain the kind and quantity," and then follows the provision that in such cases the carrier shall not insert in the bill of lading or in any notice, receipt, contract, rule, regulation, or tariff, the words, "Shipper's weight, load, and count," or other words of like purport, indicating that the goods are loaded by the shipper and the description made by him.

Section 21 deals with freight loaded by the shipper, and prescribes when descriptions in the bill of lading shall not render the carrier liable, as, for instance, when "the goods are described in a bill of lading merely by a statement of marks or labels upon them or upon packages containing them, or by a statement that the goods are said to be goods of a certain kind or quantity, or in a certain condition, or it is stated in the bill of lading that packages are said to contain goods of a certain kind or quantity or in a certain condition, or that the contents or condition of the contents of packages are unknown, or words of like purport are

contained in the bill of lading." It is further provided that, when these statements are contained in the bill, the description shall not render the carrier liable, "although the goods are not of the kind or quantity or in the condition which the marks or labels upon them indicate, or of the kind or quantity or in the condition they were said to be by the consignor." This section further provides:

"The carrier may also by inserting in the bill of lading the words 'Shipper's weight, load, and count,' or other words of like purport indicate that the goods were loaded by the shipper and the description of them made by him; and if such statement be true, the carrier shall not be liable for damages caused by the improper loading or by the nonreceipt or by the misdescription of the goods described in the bill of lading."

Section 22 is the section by which we think Congress intended to change the existing rule of liability as declared by the federal courts. That section provides:

"That if a bill of lading has been issued by a carrier or on his behalf by an agent or employee the scope of whose actual or apparent authority includes the receiving of goods and issuing bills of lading therefor for transportation in commerce among the several States and with foreign nations, the carrier shall be liable to (a) the owner of goods covered by a straight bill subject to existing right of stoppage in transitu or (b) the holder of an order bill, who has given value in good faith, relying upon the description therein of the goods, for damages caused by the nonreceipt by the carrier of all or part of the goods or their failure to correspond with the description thereof in the bill at the time of its issue."

[7] Now in the case at bar we are dealing with bulk freight loaded by the shipper, but the bill of lading does not contain any of the particular notices or recitals specified in section 21 of the Bill of Lading Act, and unless we are to hold that the mere words "weight subject to correction" are of "like purport" to the words "shipper's weight, load and count," or "shipper's weight," or are equivalent to a statement that the weight of the wheat is "said to be" 66,000 pounds, then it would seem clear that the defendant would be liable to a holder in good faith of the order bill in question "for damages caused by the nonreceipt by the carrier of all or part of the goods."

We do not overlook the fact that there are some scattering judicial pronouncements of the fact that the insertion of the words

"weight subject to correction" in a bill of lading is sufficient to avoid the effect of the estoppel which might otherwise result. In Brown v. Missouri, K. & T. R. Co., 83 Kan. 574, 112 P. 147, the Supreme Court of Kansas said: "Ordinarily bills of lading are prima facie evidence against the carrier issuing them of the amount of goods received. 4 A. & E. Encycl. of L. 522; 1 Hutchinson on Carriers, § 158. The defendant maintains that here they have not that effect, because of the insertion of the qualifying words, 'in apparent good order' and 'weights subject to correction.' It is doubtful whether the first phrase can apply to material shipped in bulk (6 Cyc. 418, 419), but in any event it does not change the effect of the instrument as prima facie evidence (4 A. & E. Encycl. of L. 522, 523, note 7; 6 Cyc. 422). The expression, "weights subject to correction," has an important function. It avoids the estoppel which would otherwise under some circumstances preclude the carrier from disputing the weight. 6 Cyc. 418. It does not destroy the prima facie effect of the recital as to quantity. It merely leaves the matter open to further inquiry, instead of being absolutely concluded. Its insertion in a bill of lading has been held, where other rights have intervened, not even to prevent the statement of weight from being conclusive, except as to minor errors. Tibbits v. R. I. & P. Ry. Co., 49 Ill. App. 567, 572."

An examination of that case, however, will show that the words in question were considered from quite a different angle than in the instant case. It was merely there held that as against the carrier the recited weights in the bill of lading was prima facie evidence of the quantity delivered, notwithstanding the words "subject to correction." Examination of 6 Cyc. 418, does not seem to yield much fruit, and we have failed to find any substantial authority to the effect that the words "weight subject to correction" have been judicially considered sufficient to avoid the estoppel which might otherwise obtain; although, as stated, the expression has been occasionally used by text-writers and others in the discussion of bills of lading. In view of the care evinced by the Congress in the act in question to point out ways and means by which the carrier may protect itself in such cases, we are not inclined to extend the language employed to doubtful limits, and we think we would be doing so to hold that the words "weight subject to correction" are of "like purport" to

any of the expressions employed in the act, or that when fairly considered it is an expression sufficient to charge a purchaser in good faith of the bill that the weights were shipper's weights.

In view of what we have said, it follows that the fourth question must be also answered in the negative, and we therefore find no error committed by the trial court, and the case is affirmed.