## THE HENRY R. TILTON.

### CHAPMAN DERRICK & WRECKING CO. v. THE HENRY R. TILTON.

### FIVE OTHER LIBELS v. SAME.

(District Court, S. D. New York. November 28, 1892.)

SALVAGE—CAPSIZED VESSELS—TOWAGE AND RIGHTING—AWARDS.

A schooner in ballast, while passing Sandy Hook, was struck by a shot from the government practice works, in consequence of which she capsized, after having been abandoned by her crew. During a period of over two days, six tugs, working at different times, and a wrecking company rendered service in getting her off the beach where she first grounded, lying by her during one night, towing her to shallow water near the entrance to New York harbor, and righting her, and finally beaching her in Gravesend bay. The court regarded the services as one continuous operation, begun and continued by the tug which first reached her, with assistance from other tugs, the chief and most valuable service being rendered by the wrecking company, without whose aid the vessel could not have been saved. At a marshal's sale she was sold for $2,900. *Held* that, as the vessel was derelict and of small value, about 75 per cent. of her value should be awarded as salvage, and divided among the tugs and the wrecking company in proportion to the services.

In Admiralty. Libels by the Chapman Derrick & Wrecking Company and the tugs Babcock, Hoehn, Vosburg, Protector, Wolcott, and Veit against the schooner Henry R. Tilton for salvage. Decree for libelants.

Mr. Murtha, for the Chapman Derrick & Wrecking Co. and The Protector.

Mr. Hough, for the Babcock.

Carpenter & Mosher, for the Veit and the Wolcott.

Hyland & Zabriskie, for the Hoehn.

BROWN, District Judge. At about 2 o'clock in the afternoon of July 9, 1892, the schooner H. R. Tilton, bound from the southward up past Sandy Hook for New York, in ballast, was struck by a shot from the government practice works at Sandy Hook, and a ball went directly through her, a little below the water line, carrying away several planks and causing her to take in water so that in a few minutes she capsized, and lay upon her beam ends to starboard, a little of her port rail remaining out of water. All her sails were set, and all of them, except the topsails, went down under water. Shortly after the accident the master and crew abandoned her in a small boat, and were soon towed up to New York. The tug Babcock was the first to come to her aid at about 4 or 5 o'clock P. M., and a few minutes afterwards the tug Hoehn arrived. Both got out lines to pull her into deeper water, as she was then aground about three miles to the southward of Sandy Hook lightship in 4 1-2 or 5 fathoms of water. Within an hour afterwards the tug Vosburg and the Protector appeared, and all four went to work pulling from time to time. Several of the hawsers were parted one or more times, and the schooner was got into deeper water. The schooner's anchor, to which the Vosburg's hawser had been made fast, was drawn overboard. When the pulling stopped, the anchor served to hold the schooner fast. About sunset the Hoehn

and the Vosburg returned to New York. It was understood that the Babcock, which was first upon the ground, and the Protector, would remain by the schooner during the night, and that nothing more could at that time be done by the tugs, or was immediately necessary. ·

The witnesses for the Protector and the Babcock claim that after the Vosburg and the Hoehn left, they towed the schooner a considerable distance towards Sandy Hook, and there is other evidence to substantiate this. Whether this was so or not, I do not find it of any great importance; since the principal service at that time was in getting the schooner off the beach. That was a dangerous position; and the fresh wind and considerable sea that night would have subjected her to danger of great additional injury, had she not been got off.

During the night of the 9th she was held fast by her anchor until about 2 or 3 o'clock A. M., when she began to drag, going out to sea. The Babcock and the Protector in the mean time lay near her, showing danger lights, as she was in the track of incoming vessels. As she dragged and went seaward, the Babcock and the Protector did not follow her until daylight. In the mean time the Wolcott had found her and lay by her until morning for the purpose of rendering assistance, and the Veit, also receiving notice of a vessel going adrift, had gone down in search of her, and reached her just after the Babcock had at daybreak overtaken her. These three tugs with the Protector, which arrived soon after, towed the schooner up near the easterly outlet of Gedney's channel, where she again grounded about 9 A. M. of the 10th. The Veit and the Wolcott claim that they did most of this towing, having run a sweep forward from under the stern of the schooner until they got a bight upon the chain above the anchor, being thus enabled to haul along the anchor and the schooner. The Protector's hawser had the night before parted near her bitts, and the other end was made fast to the anchor. The Protector having no other hawser, considerable time was occupied by her and the Babcock in finding and getting in this hawser, while the others were towing, after which she and the Babcock joined with the other two tugs in towing until the schooner grounded as above stated.

During Sunday, the 10th, the tug Chapman was sent down to render assistance; but it was found impossible to move the schooner further without first righting her. The Veit and the Protector had made some endeavors to right her by pulling on the topmast; and for the same purpose the Veit had previously taken off the foresails, some blocks, and running rigging; but these efforts to right her were unsuccessful. The articles taken by the Veit were afterwards stored. The Wolcott and the Veit left Sunday afternoon and did nothing further. The Babcock and the Protector after failing to move the schooner with the Chapman, went that night to New York for the steam derrick and pumping boat Reliance, which was procured Monday morning, and towed by them down to the wreck, where, by means of chains got under the schooner with a diver's help, she was righted about 6 o'clock P. M. of Monday, the 11th, held up in position by the Reliance alongside, and both then towed by the Babcock, the Protector, and the Chapman, through Gedney's channel into Gravesend

bay, where she was run upon the beach at about half past 9 P. M. That position not being a safe one for all weathers, she was there temporarily repaired by planking over the holes, and pumped out by the small wrecking boat, No. 13, and afterwards taken to Twenty-Seventh street, Brooklyn, where she was attached by the marshal on the 16th of July, 1892, upon the first above libel for salvage; and afterwards upon the libels subsequently filed. The repairs not being sufficient to prevent considerable leaking, No. 13 was still kept alongside, pumping more or less, night and day, to keep her afloat, until the schooner was sold by the marshal by order of the court in these causes on July 29, 1892, netting $2,900.

I cannot sustain the contention that all the service rendered prior to the grounding of the schooner near the easterly outlet of Gedney's channel on Monday forenoon is not to be regarded as a salvage service, on the ground that a place of safety had not then been reached. It is probably true that the schooner's position there was no safer and no better than on the beach some three miles below the Scotland lightship on Saturday afternoon, when the other tugs first reached her; and if the other tugs in the mean time had rendered no real service, and if in leaving her they had left with the idea of an abandonment of the enterprise of saving the vessel, then, no doubt, salvage compensation could not now be claimed by the tugs that rendered no service after the grounding at Gedney's channel.

But the narrative does not admit of this interpretation, either as to the fact or as to the intention. The drawing of the schooner off from the beach into deep water Saturday afternoon was immediately necessary; it tended to save the vessel, and probably did save her, from additional damage. The salvage service commenced by the Babcock, which was first on the ground, was a continuous service from that time until the schooner was beached in Gravesend bay. The attempt to rescue the schooner was never abandoned, or thought of being abandoned. Each step taken was a legitimate and proper step in the work. The Babcock, the first to take hold, had she been able to do the whole work, might and naturally would, have ordered the others to keep off from time to time as they came to render aid. But she was wholly unequal to the task, and on Saturday afternoon the other three tugs took hold upon her request. The Vosburg and the Hoehn left Saturday evening, because no further service from them was then needed. The Babcock and the Protector, which remained for the night, were apparently sufficient, with the schooner at anchor.

So on the following morning, the Veit and the Wolcott acted as helpers to the Babcock and the Protector, with the Babcock's acquiescence, if not express request, to tow the vessel in as far as possible on the flood tide. That was another proper step in the course of the salvage undertaking. According to the testimony of the captain of the Reliance, it was a necessary work, since upon his view the schooner in her capsized state would not have floated more than 24 hours; and even if the contrary opinion be true, that she would have floated several days, as in the similar case of the Ireland off the capes of Delaware, as stated by one of the witnesses, still it would have been a most singular mode of conducting a salvage operation to allow

the schooner to sink in deep water some three miles below the Scotland lightship, if there were tugs at hand ready to tow her into port. The fact that she would ground at Gedney's channel was not then foreseen. The attempt to move her in was a proper one; and the Veit and the Wolcott, which rendered essential aid in that stage of the work, are, therefore, entitled to some recognition as helpers in a continuous salvage service.

When the schooner had grounded off Gedney's channel, it soon became apparent that she could not be got in without being first righted; and the tugs alone could not right her. There was no more occasion, therefore, after her second grounding, for the Veit and the Wolcott to remain by, than for the Hoehn and the Vosburg before. When righted, through the employment of the Chapman Derrick & Wrecking Company, there would be no further need of their service.

Treating the whole service as one continuous salvage operation, begun and continued to the end by the Babcock, with assistance from the other tugs at its various stages, by the request or acquiescence of the Babcock, there were four stages in the work in each of which the vessels rendering aid are entitled to some allowance, viz.: (1) Getting the schooner off the beach on Saturday afternoon; (2) lying by during Saturday night; (3) towing in from sea on Sunday morning, until the grounding near Gedney's channel; (4) the operation of righting her, towing in, and beaching her at Gravesend bay. Besides these services there was additional work bestowed upon her by the Chapman Company in making temporary repairs at Gravesend bay, and in the subsequent removal and keeping of her afloat at Twenty-Seventh street, until she was sold by the marshal. Inasmuch as the vessel was derelict, the handling of her difficult, and her proceeds small, I shall allow about 75 per cent. for the whole salvage operation.

I cannot approve, or sustain in full, the charges made for the care of the schooner after she was beached. From that time until attached by the marshal she was in the hands of the representatives of the Chapman Company, and it is that company that is responsible therefor. If repaired at all, it should have been in a way that would not have required the continual service of the pumping machines afterwards. By placing the schooner upon a dry dock, the evidence shows that she could have been made temporarily tight for a comparatively small sum, and the large subsequent bills would have been avoided. I do not find that the charges made per hour are unreasonable upon the method adopted; but the method adopted was unjustifiable, and I must hold the Chapman Company, on the evidence, responsible for that. After the attachment by the marshal, his deputy declined to assume the responsibility for such expense. The service of the Chapman Company, however, in the salvage operation was the most important part of the service, in men, vessels and equipment. Without the use of a derrick, such as the Reliance had, I am satisfied the schooner could not have been saved at all.

Taking every circumstance into account, the following will, I think, be a proper distribution:

To the Chapman Company for its salvage services and all subsequent services down to the time of the sale by the marshal, $1,000;

to the Babcock, $350; to the Protector, $300; to the Hoehn and to the Vosburg, each of which broke a hawser, $75 each; to the Wolcott, $60.

I do not find that the Veit intended to appropriate the blocks, rigging, etc., which she took off and stored. But she is chargeable with misconduct in not reporting the articles to the marshal and causing them to be delivered to him when the vessel was attached. She neither did this, nor did she refer to these articles in her own libel, although those articles were under her control; but after the sale of the vessel, she caused them to be sold at private sale to the second vendee of the vessel, for $25, which sum has not been collected by any one. Her acts were calculated to injure the sale of the vessel much more than the value of the articles, and she took no pains to prevent this. Though she broke a hawser in towing, I allow her, therefore, but $40. Decree accordingly.