**OLIVIER STRAW GOODS CORPORATION v. OSAKA SHOSEN KAISHA.**

Circuit Court of Appeals, Second Circuit.
June 11, 1928.

No. 314.

1. Sales ⊙170—Delay in shipment held to warrant rejection, notwithstanding date of bill of lading and contract that bill of lading should be final as to date of shipment.

Where contract required goods to be shipped from Japan during June, July, or August, buyer was entitled to reject shipment not made until September 3, notwithstanding bill of lading was dated August 30, and notwithstanding contract provision that date of bill of lading should be final as to date of shipment.

2. Carriers ⊙56—Indorsee of bill of lading is presumably owner of shipment.

Indorsee of bill of lading is presumptively the owner of goods shipped.

3. Shipping ⊙106(3)—Ocean carrier held estopped to deny receipt on board of goods as stated in bill of lading.

Where sales contract required goods to be shipped during June, July, or August, and where seller on August 30 obtained "on board" bill of lading, though shipment was not expected to arrive for cargo until September 2, and where

goods were destroyed or stolen in carrier's warehouse before shipment, *held*, carrier was estopped to deny that it had received the shipment on board, when asked by buyer for loss resulting from acceptance of draft in reliance on bill of lading.

**4. Shipping ⊕106(2)—Master of vessel has no apparent authority to sign bills of lading without possession of goods.**

The master of a vessel has no apparent authority to sign bills of lading when he has not possession of the goods, which doctrine also applies to railroad freight agents.

**5. Shipping ⊕106(5)—Carrier, issuing clean bill of lading covering shipment manifestly damaged, is estopped as against purchaser of bill of lading misled.**

When a carrier has given a clean bill of lading, stating that cargo has been received in good order, though it was at the time manifestly damaged, the courts will hold that it is estopped to deny the truth of the assertion against a purchaser of the bill of lading misled by the representation.

**6. Shipping ⊕120—Falsely issuing "on board" bill of lading covering goods which were destroyed or stolen during earthquake before shipment, carrier could not escape liability under exemption from liability from act of God.**

Where carrier on August 30 issued "on board" bill of lading, though vessel was not expected to arrive for cargo till September 2, and where shipment was destroyed by earthquake or stolen in the confusion following it on September 1, *held*, carrier could not escape liability under provision of bill of lading exempting it from liability for loss of goods arising from acts of God.

**7. Shipping ⊕106(5)—Right of action against seller did not preclude recovery against carrier issuing "on board" bill of lading before arrival of vessel.**

That buyer may have cause of action against seller obtaining an "on board" bill of lading before arrival of vessel to receive shipment does not preclude it from recovering against carrier issuing such bill of lading.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Olivier Straw Goods Corporation against the Osaka Shosen Kaisha to recover damages for alleged failure to deliver a shipment of merchandise. From a decree (21 F.(2d) 618) dismissing the libel, libelant appeals. Reversed.

On April 16, 1923, the libelant made a written contract with Nozaki Bros. & Co., Limited, of Yokohama, Japan, by the terms of which the libelant bought 30,000 pieces of hemp braid at 42 cents per piece c. i. f. New York. The contract provided:

"Shipment to be made from Japan via Panama during June/July/August, 1923, shipper's option."

"Terms of payment confirmed bankers' foreign letter of credit to be established in favor of Nozaki Bros. & Co., Limited, Yokohama, Japan."

The following were "indorsements on back of contract":

"5. Proof of Shipment.—The date of bill of lading shall be final as to date of shipment. * * *

"7. Damage in Transit.—Goods are for buyers' account and risk as soon as sellers deliver goods to the carrier."

The libelant arranged for a letter of credit in favor of the seller with International Acceptance Bank, Inc., which was sent on April 24, 1923, by that bank to Nozaki at Yokohama, authorizing them to draw on the bank at New York up to $22,000 United States currency, to pay for this and other hemp braid. The letter of credit provided:

"Bills of lading must be dated on or before August 31, 1923, and drafts must be drawn and negotiated on or before August 31, 1923."

On August 29, 1923, Nozaki delivered to the respondent, a steamship line and a common carrier, the hemp braid which is the subject of this suit and was made up in 18 cases for shipment. A dock receipt was issued to Nozaki on that date, acknowledging receipt of the goods in shed No. 5 of the new customs compound. On the next day, August 30, 1923, the respondent issued and delivered to Nozaki its bill of lading in which it acknowledged that on that day there had been:

"Shipped in apparent good order and condition, by Nozaki Bros. & Co., Limited, on board the Osaka Shosen Kaisha's steamship Alaska Maru * * * now lying in or off the port of Yokohama, * * * eighteen (18) cases hemp braids only, * * * to be delivered over the ship's side * * * in like good order and condition, at the port of New York, N. Y., unto order of the International Acceptance Bank, Inc., New York, N. Y."

The bill of lading form contained the printed words, "shipped or delivered for shipment," but the words "or delivered for shipment" were deleted and the deletion was initialed.

On August 30, 1923, Nozaki Bros. wrote from Yokohama, advising the libelant that they had on that day shipped per the steamship Alaska Maru the 18 cases of hemp braid; they inclosed the invoice in duplicate and stated that they had drawn at four

months' sight on the International Acceptance Bank, Inc., in favor of the Japanese Bank of Taiwan for the invoice price of the merchandise.

The Bank of Taiwan received the draft, consular invoice, and bill of lading from Nozaki, and forwarded them to its representative in New York, who presented the draft and accompanying shipping documents to the International Acceptance Bank in that city on October 1, 1923. The latter accepted the draft, inasmuch as draft and shipping documents on their face indicated a shipment on August 30, and accorded with the terms of the letter of credit. As the letter of credit had been purchased for account of libelant upon the application of J. Henry Schroeder & Co., London, the International Acceptance Bank delivered the bill of lading to Schroeder's agent on October 2, and obtained the usual trust receipt from the latter, whereby Schroeder agreed to keep the goods and the proceeds thereof separate as the property of the bank, to be applied against its acceptance under the terms of the letter of credit. The shipping documents were delivered to the libelant about October 25. About the same date the Alaska Maru arrived at New York without libelant's merchandise on board. The draft was accepted on October 1 by the International Acceptance Bank in accordance with the requirements of its letter of credit, and without any knowledge on its part or on the part of libelant that the goods had not been shipped on the Alaska Maru, as the bill of lading had specified. On November 1, the libelant first learned from the Barber Steamship Lines, agents for the vessel, that no Yokohama cargo had been put aboard, and that the merchandise in question had not been discharged at New York. When the draft which had been accepted by the International Acceptance Bank on October 1 became due January 31, 1924, it was paid by Schroeder's agent, who in turn was reimbursed by the libelant in accordance with the contract made when the letter of credit was originally purchased in April.

On September 1, 1923, the Japan earthquake occurred. In spite of the acknowledgment in the bill of lading, bearing date August 30, 1923, that the goods mentioned therein were shipped by Nozaki on board the Alaska Maru, the respondent had not taken the merchandise on board on that or any other date. At the time of the earthquake it was still in shed No. 5 of the customs compound at Yokohama. When the bill of lading was issued, the Alaska Maru was at Kobe, 354 miles from Yokohama, and

the respondent did not expect her to arrive there until September 2. These facts appear to have been known to the shipper, who afterwards stated to the surveyor, Philipsen, that the merchandise had been delivered to the respondent on August 29, for shipment September 3. The Alaska Maru was in fact ordered by the Japanese authorities not to take on any cargo at Yokohama, but to rescue refugees and to proceed to New York without Yokohama cargo. The loading of cargo at that port was, moreover, said to be impossible, owing to "the confusion caused by the earthquake."

On October 26, nearly two months after the earthquake, 10 of the cases of hemp braid were found empty near the shed where they had been stored and the remaining 8 cases were never found. The merchandise was left unprotected, when the whole city of Yokohama was in confusion, in shed No. 5, the door of which had been burst open by the convulsion. The respondent apparently had no means of guarding cargoes left with the customs. Men were fleeing for their lives, and the proofs indicate that the goods fell into the hands of looters, who seem to have had a free hand during the time of panic. Much of the testimony as to looting consisted of general reports of conditions in Yokohama, but there was some direct testimony that many cases of merchandise in shed No. 5 were "broken and/or opened and their contents missing and/or damaged," in addition to the proof that 10 cases of hemp braid were found near the shed with covers off and contents removed, and that the other 8 cases could not be traced. It seems to have been fairly established that the merchandise was stolen, without the fault of the respondent, during the confusion accompanying the earthquake.

The libelant, as indorsee of the bill of lading and owner of the merchandise, filed its libel against the steamship company to recover damages for breach of the promise in the bill of lading to deliver the merchandise. The steamship company, by way of answer, pleaded the following provisions of the bill of lading:

"2. The act of God, * * * fire, * * * and all and every other danger, accident of land, seas and rivers, and/or navigation, of whatsoever nature and kind, always excepted. * * * The ship and/or carrier shall not be liable for the consequences of * * * mobs, * * * robbers, thieves, or pilferers by land or water; * * * fire or water on board, in hulk, in craft, and/or on shore; explosion."

The District Judge held that, as between shipper and carrier, the recital in the bill of lading that the merchandise was received on board was a mere acknowledgment of receipt, which could be contradicted, if erroneous; that any liability of the carrier to the owner of the goods and the indorsee of the bill of lading must rest upon estoppel; and that no foundation had been laid for an estoppel because, when the bill of lading was issued, the carrier acted in good faith and there was no reason to believe that any one would be prejudiced by the recital that the merchandise was on board, or that the acceptance of the draft would be influenced by it. He consequently permitted the carrier to show that the loss was occasioned and the voyage prevented by causes for which it was not liable under the terms of its contract, and upon the proof dismissed the libel.

Bigham, Englar & Jones, of New York City (Henry N. Longley and Roger H. Loughran, both of New York City, of counsel), for appellant.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge (after stating the facts as above). [1] As between Nozaki and the libelant the contract was never in fact performed, because the goods were not shipped in June, July, or August, as the agreement required. The libelant could have rejected them, even if they had finally gone forward and reached New York, for time was of the essence, and the breach was in limine. Jones v. United States, 96 U. S. 24, 24 L. Ed. 644; Norrington v. Wright, 115 U. S. 188, 6 S. Ct. 12, 29 L. Ed. 366; Oshinsky v. Lorraine Mfg. Co. (C. C. A.) 187 F. 120; Hill v. Blake, 97 N. Y. 216; Bowes v. Shand (1877) 2 App. Cas. 455; Aron v. Compton Wegimont, [1921] 3 K. B. 435.

A possible contention may be made to the contrary, based on the clause of the indorsement on the back of the contract which provides:

"5. Proof of Shipment.—The date of bill of lading shall be final as to date of shipment. * * * "

But in the body of the contract is the requirement:

"Shipment to be made from Japan via Panama during June/July/August, 1923, shippers' option."

And there is no provision anywhere permitting the issue of a bill of lading before the goods are actually shipped. The most that indorsement No. 5 could mean is that, after the merchandise was once on board, the date of the bill of lading should fix the date of shipment. What the purpose of such a provision can be is hard to say, but it certainly cannot be thought to have been to change a contract which set a definite limit for the date of shipment into an agreement requiring nothing more than "delivery for shipment" to the carrier within the time. Such an interpretation would contradict the requirement of shipment before a certain date, and would render the time when the goods were likely to arrive doubly uncertain.

Nor can indorsement No. 7 alter the plain provisions contained in the body of the contract. It only provided that the merchandise should be at the risk of the purchaser after the seller had made delivery to the carrier, and had nothing to do with the obligation of the seller to ship by the agreed date. If Nozaki failed in that obligation, he had not performed his contract, and there was no obligation on the part of the libelant to take or pay for the goods.

It is quite evident from the foregoing that the contract between libelant and Nozaki required shipment not later than August 31, 1923, and that the letter of credit purchased by the libelant corresponded with the terms of the contract and called for a bill of lading of like date showing such shipment. The letter of credit did not in so many words specify an on-board bill of lading, but that is what the words "bill of lading" meant. The Henry R. Tilton (D. C.) 53 F. 139; Rowley v. Bigelow, 12 Pick. (Mass.) 307, 23 Am. Dec. 607; Diamond Alkali Export Corporation v. Fl. Bourgeois, [1921] 3 K. B. 443; Scrutton on Charter Parties and Bills of Lading (11th Ed.) p. 9. Thus the letter of credit, requiring in fact payment only upon production of an "on-board" bill of lading, was honored because the bill of lading issued by the respondent contained a misrepresentation as to the truth.

It is thus clear that there can be no defense based upon the contention that the contract of libelant and Nozaki did not require an on-board bill of lading, or that the letter of credit did not call for payment against such a document, and that the words "on board," in the bill of lading as issued, were surplusage, because not required by the contract between the original parties.

But it is said that the bill of lading involved no warranty that the goods were

shipped on August 30, and was open to explanation as against the libelant, as it would have been as against Nozaki, if he were bringing suit. The two situations, however, are quite different.

[2, 3] The libelant, as indorsee of the bill of lading, is presumptively the owner of the goods shipped on the Alaska Maru under date of August 30, 1923, and as such is entitled to sue. Transmarine Corporation v. Levitt & Co. (C. C. A.) 25 F.(2d) 275. If the goods had really thus been shipped, the merchandise would not have been subjected to loss through the looting which occurred on shore at the time of the earthquake. While Nozaki would not have been in position to contend that the goods had been thus shipped, because he knew better and had not been misled, the libelant knew nothing about his default until after the International Acceptance Bank had accepted Nozaki's draft on the faith of a bill of lading which represented that the goods were on board the vessel within the time called for by the contract between Nozaki and the libelant. If the bill of lading had not been incorrectly dated in August, it would not have conformed to the terms of the letter of credit, and the bank would not have honored the draft which the libelant had afterwards to make good. Hence by the representation to the bank that the merchandise was on board August 30, 1923, contained in the predated bill of lading, a series of obligations were brought into being which terminated in a payment by libelant of the purchase price for goods which it was never under any obligation to take or pay for, because of the seller's default in shipment at the time called for by the contract. This was a complete estoppel, for it must be assumed that such a document as a bill of lading will be acted on.

It cannot be contended that a "received for shipment" bill of lading would have been sufficient to require the International Acceptance Bank to honor the bill of lading, and that, therefore, it was not misled by the form of bill of lading presented, for there was no attempt to prove a custom to honor "received for shipment" documents as bills of lading, as there was in Vietor v. National City Bank, 200 App. Div. 557, 193 N. Y. S. 868.

[4] It is true that it has for years been held by the English and federal courts that the master of a vessel has no apparent authority to sign bills of lading when he has not possession of the goods, and the same doctrine has been applied to railroad freight agents. Grant v. Norway, 10 C. B. 665; George

Whitechurch, Ltd., v. Cavanagh, [1902] A. C. 117; Pollard v. Vinton, 105 U. S. 7, 26 L. Ed. 998; Schooner Freeman v. Buckingham, 18 How. 182, 15 L. Ed. 341. But here the merchandise was in the hands of the carrier, and it cannot be, and we understand is not, contended that the bill of lading was issued without apparent authority. Certainly no such defense is suggested by the answer. The trial judge relied upon Atchison, Topeka & Santa Fé Ry. Co. v. Harold, 241 U. S. 371, 36 S. Ct. 665, 60 L. Ed. 1050, as holding that "purchasers of bills of lading acquire no greater rights than the original shippers"; but there the bill of lading was issued when the goods were in the possession of another railroad, so that the doctrine of Pollard v. Vinton, supra, that the acts of the railroad agent were not within the scope of his authority, applied.

[5] When a carrier has given a clean bill of lading, stating that cargo has been received in good order, though it was at the time manifestly damaged, the courts hold that it is estopped to deny the truth of the assertion against a purchaser of the bill of lading, who has been misled by the representation and has altered his position to his detriment on the faith of the representation. Compania Naviera Vasconzada v. Churchill & Sim, [1906] 1 K. B. 237; Martineau, Ltd., v. Royal Mail Co., [1912] 17 Com. Cases, 176; Higgins v. Anglo-Algerian S. S. Co., 160 C. C. A. 396, 248 F. 386; Relyea v. New Haven Rolling-Mill Co. (D. C.) 75 F. 420; Bradstreet v. Heran, Fed. Cas. No. 1792a; Sears v. Wingate, 85 Allen (Mass.) 103. We can see no difference in principle between a misrepresentation as to the condition of merchandise and a misrepresentation that it is on board, when it is not. Either furnishes a basis for an estoppel.

In The Isla de Panay, 267 U. S. 260, 45 S. Ct. 269, 69 L. Ed. 603, the Supreme Court seems to have sanctioned the doctrine of Higgins v. Anglo-Algerian S. S. Co., supra, though the case was distinguished on the ground that in The Isla de Panay a failure to note on the bill of lading that cargo was damaged caused no estoppel, as it was not accompanied by a statement that the goods were received in good order and condition.

[6] The exception in the bill of lading exempting the carrier from liability for losses arising from acts of God is clearly unavailable as a defense, because of the estoppel which precludes the respondent from denying that the goods were on board the Alaska Maru on August 30. Assuming, as we must, that they were on the vessel at that date, the

earthquake and robbers could not have affected them.

It is, of course, quite clear why the bill of lading, reciting that the goods were. on board, was dated August 30, although the shipper knew that the vessel was not to arrive at Yokohama until September 2, and would not sail before the next day. The reason was that Nozaki had a contract with the libelant that shipment was to be made during June, July or August, 1923, and a failure to ship before September would be a cause of cancellation. Moreover, the letter of credit by the International Acceptance Bank provided that bills of lading must be dated on or before August 31 and drafts must be drawn on or before that date.

Consequently, though the shipper could have had no idea that anything so unforeseeable as an earthquake would prevent the transportation of the goods, he. did intend to procure the issue of shipping documents which would represent the merchandise as shipped at a time when it was not in fact on board, and he also intended to make it appear that he had performed his contract, when he was really in default.

However common the practice may be of issuing on-board bills of lading when the goods are not yet laden, the practice is at best extremely negligent. It not only may mislead merchants as to their actual contract rights, but, if recognized as valid, is likely to deprive purchasers who import merchandise, banks financing their operations, and companies insuring the goods against risks of that certainty as to their rights and obligations which truthful conduct and fair business dealing at least tend to promote.

The reason why consignees and banks so often desire on-board bills of lading is that at least some risks, such as fires on shore and delay in shipment, are left behind when the merchandise gets on the ship. At any rate, on-board bills of lading are often, as here, a requirement of the importer. In such circumstances there should be no sanction for an easy, unreliable practice of issuing bills which purport to be on-board bills, when merchandise has been delivered to the carrier, but has not been shipped.)

[7] The libelant has been prejudiced because, if a true bill of lading had been issued, it would have been able to cancel its contract with Nozaki, for failure to ship the goods in time, without incurring any liability to the bank, which would not have honored the draft on presentment of a "delivered for shipment" bill of lading. It has been further

prejudiced by being forced to reimburse the bank, in order to pay for goods which it never contracted to pay for unless actually shipped, goods which would have been in a place free from the special dangers that caused their loss, if the representations upon which the bank honored the letter of credit had been true. While the libelant may have a cause of action against Nozaki, it is not compelled to pursue it, but may rely on the estoppel, and assert its rights against the respondent because of the representations in the bill of lading. Compania Naviera Vasconzada v. Churchill & Sim, [1906] 1 K. B. 237.

We hold the respondent estopped to deny that the hemp braid was shipped on the Alaska Maru on August 30. If shipment be taken as of that date, the exceptions in the bill of lading relied on can have no application. The libelant is entitled to an interlocutory decree providing for an assessment of the damages caused by the failure of the respondent to deliver the merchandise according to the terms of the bill of lading.

The decree is reversed and the cause remanded.