**ELGIE & COMPANY,**
**Plaintiff-Appellant,**

v.

**S. S. "S. A. NEDERBURG", her engines, boilers, etc., and South African Marine Corporation, Ltd., Defendant-Appellee and Third-Party Plaintiff-Appellant,**

v.

**INTERNATIONAL TERMINAL OPERATING CO., INC., Third-Party Defendant-Appellee.**

Nos. 379, 643, Dockets 76–7510, 76–7562.

United States Court of Appeals,
Second Circuit.

Argued Jan. 19, 1979.
Decided June 11, 1979.

---

John T. Kochendorfer, New York City (Bigham, Englar, Jones & Houston, New York City, of counsel), for plaintiff-appellant.

M. E. DeOrchis, New York City (Haight, Gardner, Poor & Havens, New York City, Brian D. Starer and Nicholas H. Cobbs, New York City, of counsel), for defendant-appellee and third party plaintiff-appellant.

Robert E. Daley, New York City, Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, for third-party defendant-appellee.

Before WATERMAN, FEINBERG and VAN GRAAFEILAND, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

On March 24, 1974, the S. A. Nederburg, owned and operated by South African Marine Corporation, Ltd., sailed from New York City bound for South Africa. Several days later, South African issued an on-board order bill of lading indicating that the Nederburg was carrying eleven cartons and one crate of optical machinery and accessories for discharge at Durban, South Africa. The equipment had been sold by the consignor, Shuron Continental, an American manufacturer, to plaintiff, Elgie, a Durban company, and payment was to be made pursuant to a draft against an irrevocable letter of credit established in Shuron's favor by Barclays Bank D.C.O. for Elgie's account. The letter of credit required that the draft be accompanied by a full set of clean on-board bills of lading marked "freight prepaid". On April 16, 1974, Shuron presented its draft, together with South African's bill of lading and other pertinent documents, to Barclays and received payment.

It is now conceded by all parties that the crate, which contained a lens-grinding machine, was never aboard the Nederburg. In fact, the crate has simply disappeared. Elgie instituted suit against South African in the Southern District of New York and established that its total damages resulting from the non-delivery were $10,559.47. However, South African's bill of lading[1] contained the $500 per package limitation of liability clause permitted by section 4(5) of COGSA (46 U.S.C. § 1304(5)), and the judgment appealed from limited plaintiff's recovery to that amount. The judgment also denied recovery over by South African against International Terminal Operating Co., Inc. (ITO), the terminal company that received the shipment and undertook to load it. Plaintiff appeals from that portion of the judgment limiting its recovery to $500. Defendant appeals from the judg-

---

1. Although South African's bill of lading was a Short Form Bill, it incorporated by reference the carrier's regular form which contained the limitation of liability clause.

ment in plaintiff's favor and the dismissal of its third-party complaint against ITO.

The appeal has been argued twice. After the first argument, this Court *sua sponte* raised the question whether section 22 of the Pomerene Bills of Lading Act (49 U.S.C. § 102) applied to the circumstances of this case and, if so, whether the plaintiff should recover the full amount of its damages, rather than $500.[2] We remanded to the district court for further factual findings and a determination of the legal issues thus raised. On remand, none of the parties offered any additional testimony, although given the opportunity to do so. The district judge found, nonetheless, that the missing crate had been loaded on the S. S. Morgenster, another of defendant's ships, which had sailed for Durban from New York on March 16, 1974.[3] He also concluded once again that plaintiff's recovery must be limited to $500. This determination was not based upon the aforementioned factual finding, however, but upon the district judge's interpretation of section 22.

The district judge interpreted the term "description", as used in section 22, to cover only the character or nature of the goods referred to in the bill of lading, not their quantity. He concluded, therefore, that the bill of lading's reference to eleven cartons and one crate was not a misdescription of the goods. He held further that, if section 22 were construed to cover misstatements as to quantity, the $500 limitation would nonetheless be applicable, because section 22 of the Pomerene Act was intended only to curb deliberate fraud. Our examination of that section in its historical context convinces us that the able district judge misconstrued it.

In 1916, when Pomerene was enacted, there was already a substantial body of law holding carriers liable to consignees and good faith assignees for value for misrepresentations in their bills of lading. *See The Carso*, 43 F.2d 736 (S.D.N.Y.1930), *aff'd in part and rev'd in part*, 53 F.2d 374 (2d Cir. 1931). However, federal courts limited the application of this rule by holding that a carrier's agent issuing a bill of lading had no implied authority to represent that goods had been received when actually they had not. *See Friedlander v. Texas & P. Ry.*, 130 U.S. 416, 9 S.Ct. 570, 32 L.Ed. 991 (1889). New York law was to the contrary, *see, e. g., Bank of Batavia v. New York L.E. and W.R.R.*, 106 N.Y. 195, 12 N.E. 433 (1887), and section 22 was enacted for the purpose of adopting a rule like that of New York. *Gleason v. Seaboard Air Line Ry.*, 278 U.S. 349, 354–55, 49 S.Ct. 161, 73 L.Ed. 415 (1929); *Josephy v. Panhandle and S. F. Ry.*, 235 N.Y. 306, 310, 139 N.E. 277 (1923). With this purpose in mind, Congress could not have intended the term "description" in section 22 to apply only to the nature of the goods being shipped. Indeed, Congress' expressed intent was to plug the "loophole" represented by the *Friedlander* line of authorities by providing that a "carrier shall be liable for goods receipted for by its representatives even though they may not actually have been received." *See* S.Rep. 742, 74th Cong. 1st Sess. (1935).

An examination of section 22 as it was originally enacted makes it quite clear that this was the congressional intent. The original statute made no reference to the date of shipment. It provided that the carrier would be liable to "the holder of an order bill, who has given value in good faith, relying upon the description therein of the

---

2. Section 22 was not repealed by COGSA. *See* 46 U.S.C. § 1303(4). So far as pertinent, § 22 provides that if a bill of lading has been issued by the carrier, the carrier shall be liable to "the holder of an order bill, who has given value in good faith, relying upon the description therein of the goods, or upon the shipment being made upon the date therein shown, for damages caused by the nonreceipt by the carrier of all or part of the goods upon or prior to the date therein shown, or their failure to correspond

with the description thereof in the bill at the time of its issue."

3. The entire shipment was originally booked to go aboard the Morgenster. South African asserts, however, that ITO informed it the shipment had been shut out from the Morgenster and loaded on the Nederburg. Accordingly, the bill of lading delivered to the consignor and negotiated to plaintiff represented that the crate was aboard the Nederburg.

goods, for damages caused by the nonreceipt by the carrier of all or part of the goods or their failure to correspond with the description thereof in the bill at the time of its issue." *See* 39 Stat. 542 (1916). The only reasonable construction that can be placed upon this language is that "description" of goods includes the quantity involved.[4]

On shipments originating outside the United States and thus not covered by the Pomerene Act, a carrier is bound by its representations concerning on-board quantities. *General Foods Corp. v. The Felipe Camarao*, 172 F.2d 131, 133 (2d Cir.), *cert. denied*, 337 U.S. 908, 69 S.Ct. 1047, 93 L.Ed. 1720 (1949); *A. L. Holden v. S. S. Kendall Fish*, 212 F.Supp. 106, 110 (E.D.La.1962); *Insurance Company of North America v. The S. S. Exminster*, 127 F.Supp. 541, 542 (S.D.N.Y.1954).[5] Congress could not have intended to impose a lesser standard of care by the enactment of section 22. *See Portland Fish Co. v. States Steamship Co.*, 510 F.2d 628, 631–32 (9th Cir. 1974); *Pacific Micronesian Line, Inc. v. New Zealand Insurance Co.*, 397 F.2d 236, 237 (9th Cir. 1968). It follows that defendant did not accurately describe the shipment of eleven cartons by calling it eleven cartons and a crate and that it misrepresented the shipment in so doing. *Plata American Trading, Inc. v. Lancashire*, 29 Misc.2d 246, 250, 214 N.Y.S.2d 43 (1957), *aff'd*, 6 A.D.2d 1036, 178 N.Y.S.2d 1021 (1958), *leave to appeal denied*, 7 A.D.2d 838, 182 N.Y.S.2d 295 (1959).

Contrary to the finding of the district court, there is no indication that Congress intended civil liability to flow from fraudulent misrepresentations only. *Cf.* 49 U.S.C. § 121 dealing with criminal liability. Section 20 of the Pomerene Act (49 U.S.C. § 100) provides in part that when packaged goods are loaded by a carrier, the carrier shall count the packages. A fair implication of this is that the carrier must state in the bill of lading the number of packages so counted. *Leigh Ellis & Co. v. Payne*, 274 F. 443, 446 (N.D.Ga.), *aff'd on other grounds*, 276 F. 400 (5th Cir. 1921), *aff'd*, 260 U.S. 682, 43 S.Ct. 243, 67 L.Ed. 460 (1923); Knauth, *Ocean Bills of Lading* 405–06 (1953). Section 22 does not require that a misstatement of that count be fraudulent or intentional in order that liability ensue. This is the common law rule. *See General Foods Corp. v. The Felipe Camarao, supra*, 172 F.2d 131; *Bradstreet v. Heran*, 2 Blatchf. 116, 3 Fed.Cas. 1183, No. 1792a (1849); *Fleck & Hillman v. Wabash Ry.*, 200 App.Div. 482, 193 N.Y.S. 131, *leave to appeal denied*, 202 App.Div. 741, 194 N.Y.S. 934 (1922); *Campania Naviera Vasconzada v. Churchill & Sim*, 1 K.B. 237, 248 (1906). The Pomerene Act, which was designed to improve the negotiability of bills of lading, did not impose a lesser obligation on issuing carriers. *See Chicago & N. W. Ry. v. Stephens Nat. Bank*, 75 F.2d 398, 401 (8th Cir.), *cert. denied*, 295 U.S. 738, 55 S.Ct. 650, 79 L.Ed. 1685 (1935); *Chicago & N. W. Ry. v. Bewsher*, 6 F.2d 947, 953 (8th Cir. 1925), *cert. denied*, 270 U.S. 641, 46 S.Ct. 205, 70 L.Ed. 775 (1926); *Leigh Ellis & Co. v. Payne, supra*, 274 F. at 446.[6]

---

**4.** The 1927 amendment of § 22, 44 Stat. 1450, which inserted the provisions relating to the date of shipment, made the date also a part of the description of the goods. *Toho Bussan Kaisha, Ltd. v. American President Lines, Ltd.*, 155 F.Supp. 886, 890–91 (S.D.N.Y.1957), *aff'd*, 265 F.2d 418 (2d Cir. 1959).

**5.** The carrier is also bound by representations as to the condition of its lading or its method of stowage. *Demsey & Associates, Inc. v. S. S. Sea Star*, 461 F.2d 1009, 1015 (2d Cir. 1972); *Baltic Cotton Co. v. United States*, 55 F.2d 568, 569 (5th Cir. 1932); *Dupont DeNemours International S. A. v. S. S. Mormacvega*, 312 F.Supp. 322 (S.D.N.Y.1970).

**6.** Liability to good faith transferees for value for misstatements in a bill of lading has generally been based on the doctrine of estoppel. *Portland Fish Co. v. States Steamship Co., supra*, 510 F.2d at 631; *Olivier Straw Goods Corp. v. Osaka Shosen Kaisha, supra*, 27 F.2d at 133. Equitable principles play an important role in the law of admiralty, *Demsey & Associates, Inc. v. S. S. Sea Star*, 500 F.2d 409, 411 (2d Cir. 1974), and the better rule has long been that equitable estoppel can come into being without intentional misrepresentation. *See Leather Manufacturers' Bank v. Morgan*, 117 U.S. 96, 108, 6 S.Ct. 657, 29 L.Ed. 811 (1886); *Columbia Broadcasting System, Inc. v. Stokely-Vancamp, Inc.*, 522 F.2d 369, 378–79 (2d Cir. 1975); 12 *Williston on Contracts* § 1508 (3d ed.

There can be no question that plaintiff gave value in good faith relying upon defendant's bill of lading. Defendant conceded plaintiff's status as a holder in due course in its answer to plaintiff's interrogatories. Freight for the missing crate was prepaid by the consignor which was reimbursed by plaintiff. The draft by which payment of the freight and purchase price was secured had to be accompanied by a clean bill of lading, and payment was made because defendant's bill was clean. *See General Foods Corporation v. The Felipe Camarao, supra,* 172 F.2d at 132; *Olivier Straw Goods Corp. v. Osaka Shosen Kaisha,* 27 F.2d 129, 133 (2d Cir.), *cert. denied,* 278 U.S. 618, 49 S.Ct. 22, 73 L.Ed. 540 (1928); Knauth, *supra,* at 405–06. Plaintiff's proof established, therefore, its right of recovery under section 22.

We conclude also that plaintiff was entitled to recover the full amount of its damages. The Pomerene Act contains no limitation of liability provisions similar to section 4(5) of COGSA. Section 22 provides that a holder in good faith for value of an order bill is entitled to recover its "damages". This means "any damage he may have sustained." *Toho Bussan Kaisha Ltd. v. American President Lines, supra,* 155 F.Supp. at 891. Because COGSA specifically provides that none of its provisions shall be construed as repealing or limiting any of Pomerene's, it would seem that the right of full recovery provided for in section 22 survived the enactment of COGSA.

This interpretation is supported by established doctrines of admiralty law. In *Olivier II,* 47 F.2d 878, 879 (2d Cir.), *cert. denied,* 283 U.S. 856, 51 S.Ct. 648, 75 L.Ed. 1462 (1931), this court held a statement in a bill of lading that goods were on board to be a warranty whose breach prevented the carrier from invoking limitation of liability clauses against a good faith purchaser of

the bill. We likened the carrier's misstatement to a substantial deviation in voyage or stowage which would also nullify valuation clauses. *Id.* at 880; *see Insurance Company of North America v. The S. S. Exminster, supra,* 127 F.Supp. at 542. We continue to recognize the doctrine of quasi-deviation, *see Encyclopaedia Britannica, Inc. v. S. S. Hong Kong Producer,* 422 F.2d 7, 18 (2d Cir. 1969), *cert. denied,* 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970), although we are disinclined to extend it. *See Iligan Integrated Steel Mills, Inc. v. S. S. John Weyerhaeuser,* 507 F.2d 68, 71–72 (2d Cir. 1974), *cert. denied,* 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975). In allowing plaintiff full recovery herein, we are not extending the principles enunciated in *Olivier.* In view of the underlying purpose of section 22, we do not feel compelled to reject them.

The presence on board of goods for which an on-board bill of lading has been issued is of significant importance to transferees for value of the bill. *See* 10 *Williston on Contracts* §§ 1079–80 (3d ed. 1967); *Uniform Customs and Practice for Documentary Credits,* Art. 18, *reprinted in id.* at 101. We are not persuaded by defendant's argument that it has satisfied its obligation to plaintiff so long as the crate was somewhere in its possession. *See Miles Metal Corp. v. M. S. Havjo,* 494 F.2d 563, 565 (2nd Cir. 1974). Plaintiff did not make payment on the basis of a dock receipt or a "received for payment" bill of lading. *See Olivier, supra,* 27 F.2d at 133.[7] Moreover, we are not dealing here with shut-out cargo that was delivered safely on another ship, *cf. The Baltic,* 212 F. 759 (S.D.N.Y.1914), but with cargo already misplaced when the bill of lading was issued and never subsequently delivered. *Cf. General Foods Corp. v. The Felipe Camarao, supra,* 172 F.2d 131. Defendant's original position was that the missing crate had not been loaded on the Morgenster. Adjusting their sails to the

---

1970). It is unlikely that, when Congress codified the estoppel principle in § 22, *see Portland Fish Co. v. States Steamship Co., supra,* 510 F.2d at 631, it intended to change its traditional meaning.

7. The district court's assertion that the parties must have conducted themselves with the expectation that the limitation of liability provisions would control was a boot-strap argument which assumed the answer to the question the court was considering.

prevailing wind, defendant's attorneys now support ITO's contention that it was so loaded. However, they continue to insist that this was done without South African's knowledge. Unquestionably, if the crate left New York on the Morgenster, it did so without covering shipping documentation. If the "on-board" designation in a bill of lading is to have any meaning to a holder in due course, its use in the instant case must be treated as a misdescription under section 22.

Limitation of the carrier's liability under the circumstances of this case would run counter to the intent of Congress, which was to encourage the negotiation of bills of lading. We conclude, therefore, that plaintiff is entitled to full recovery.

### THE LIABILITY OVER

In its third-party complaint against ITO, South African alleged that if the crate was lost, the loss occurred when it was in the custody of ITO and was caused by the fault and neglect of ITO in violation of its warranty to perform its services in a workmanlike manner. The district court found, however, that ITO had loaded the crate on the Morgenster, and the dispute between South African and ITO now centers on whether South African was misinformed as to the location of the loaded crate.

South African's witnesses testified that, when a shipment is shut out, South African receives in a separate "shut-out" envelope a copy of ITO's dock receipt covering that shipment. If no breakdown is shown on the receipt, it means that the entire shipment has been shut out. If the shut-out is partial, this will be indicated on the receipt. South African's documentation manager testified that after the Morgenster had sailed, he received a dock receipt from ITO indicating that the entire shipment had been shut out. He then prepared a list, Exhibit G in evidence, indicating that the entire shipment was to go forward on the Nederburg, and the bill of lading was changed so to indicate.

ITO's witnesses testified, on the other hand, that none of the shipment was shut out from the Morgenster and that the eleven cartons were left behind accidentally. For this reason, ITO sent South African no shut-out documents covering the Shuron shipment. However, testimony was received without objection that it was customary for ITO to notify South African if cargo was inadvertently left behind.

The district judge found that both South African and ITO were to some degree negligent and responsible for the issuance of the erroneous bill of lading. However, Elgie did not sue South African for negligence, and South African is seeking indemnification for breach of warranty, not contribution from a joint tort feasor. *See Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 114–15, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1973); *Italia Societa Per Azioni Di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 321, 84 S.Ct. 748, 11 L.Ed.2d 732 (1963). The merit of its claim must therefore be determined by reference to the terms of its contract.

The relationship between South African and ITO was governed by a written contract which required ITO to provide wharfage for South African's cargoes and to stevedore its ships. The contract provided that ITO would be liable for loss of cargo "overside" through its negligence and that, with respect to claims for loss of cargo, ITO's liability would be limited "to such claims that result from fraud on the part of employees of [ITO] engaged in the delivery, receiving and watching of cargo." The contract provided further that it constituted the full agreement between the parties and that "no warranty of any nature shall be implied from any of the wording of this agreement."

It is readily apparent that South African has permitted ITO to limit greatly its liability under the terms of this contract. South African does not point to any expressed undertaking by ITO the breach of which entitled South African to recover over. We are satisfied, moreover, that South African has contracted away its right of recovery for breach of any implied warranty.

Although disclaimers of the implied warranty of workmanlike service are not looked upon with favor and are strictly construed, *David Crystal, Inc. v. Cunard Steam-Ship Co.*, 339 F.2d 295, 299–300 (2d Cir. 1964), *cert. denied*, 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965), it does not follow that a disclaimer cannot be effected with a properly drawn clause. *See DeGioia v. United States Lines Co.*, 304 F.2d 421, 426 (2d Cir. 1962); *cf. Dery v. Wyer*, 265 F.2d 804, 810 (2d Cir. 1959) (even division of loss in railroad negligence case); *Alcoa Steamship Co. v. Charles Ferran & Co.*, 383 F.2d 46, 54–55 (5th Cir. 1967) ("red letter" clause limiting liability in ship repair contract); *Hudson Waterways Corp. v. Coastal Marine Service, Inc.*, 436 F.Supp. 597, 603–07 (E.D. Tex.1977) (same). Where, as here, the contract between two business concerns operating at arms' length provides that "no warranty of any nature shall be implied", there is no good reason for "invoking some artificial rule of construction to cut down on the natural meaning of the words." *David Crystal, Inc. v. Cunard Steam-Ship Co., supra*, 339 F.2d at 301 (Friendly, J., concurring and dissenting in part). Accordingly, we affirm so much of the judgment appealed from as denies South African's claim for indemnity against ITO.

The matter is remanded to the district court with instructions to enter judgment in favor of plaintiff in the amount of $10,559.47 plus interest and costs. That portion of the judgment which denies South African recovery over against ITO is affirmed. Attorneys fees shall not be allowed any party.